# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARLAND
### (Northern Division)

| | | |
|---|---|---|
| ANTHONY BROWN, *et al.*, | * | |
| *Plaintiffs,* | * | |
| | | Case No. 1:11-cv-00667-JKB |
| v. | * | |
| ALLIED HOME MORTGAGE CAPITAL | * | |
| CORPORATION, | | |
| | * | |
| *Defendant.* | * | |
| | * | |

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM IN OPPOSITION TO DEFENDANT ALLIED HOME MORTGAGE CAPITAL CORPORATION'S MOTION TO COMPEL ARBITRATION AND TO DISMISS COMPLAINT OR IN THE ALTERNATIVE TO STAY PROCEEDINGS

Richard S. Gordon
Benjamin H. Carney
QUINN, GORDON & WOLF, CHTD.
102 West Pennsylvania Ave., Suite 402
Baltimore, Maryland  21204
(410) 825-2300

Nevett Steele, Jr.
LAW OFFICE OF NEVETT STEELE, JR.
102 W. Pennsylvania Ave., Suite 402
Towson, MD 21204
Ph:  410.487.2333

*Attorneys for Plaintiffs*

April 11, 2011

# TABLE OF CONTENTS

Pages

I.  INTRODUCTION ........................................................................................................1

II. BACKGROUND .........................................................................................................2

    a.  Previous Litigation Involving the Plaintiffs' Table Funded Transactions, and Allied's Admission that Plaintiffs' Loans Were Table Funded....................2

    b.  Allegations of the Complaint and Procedural History.....................................4

    c.  The Purported Arbitration Agreement..............................................................7

III.  ARGUMENT .............................................................................................................8

    a.  Named Plaintiff Timothy Washington Has Affirmatively Rejected Any Arbitration Agreements With Allied, and Has Not Received Any Arbitration Agreements Signed by Allied .................................................................................8

    b.  Arbitration Cannot Be Compelled Because No Arbitration Agreement Exists Between the Parties – and Other Courts Have Rejected the Same Arbitration "Agreement" in Similar Circumstances .................................10

    c.  Allied Assigned Away Any Rights Under the Arbitration Document in the Browns' Transaction in October 2002, Long Before It Ever Attempted to Sign the "Agreement."...................................................................................15

    d. Wells Fargo, the Assignee of the Browns' Loan File Including the Arbitration Document, Waived All Arbitration Rights on the Browns' Transaction.........................................................................................................17

    e. Plaintiffs Revoked Their Offer to Enter Into the Arbitration Agreement by Filing Their Lawsuit Prior to the Date Defendant Signed the Agreement....19

    f. The Purported Arbitration "Agreement" is Not Supported by the Consideration Recited in the Document Itself.....................................................20

    g. Plaintiffs Have Not Waived Allied's Countersignature ...................................21

    h. Plaintiffs Should Be Allowed to Conduct Discovery if Necessary...................26

IV.  CONCLUSION ........................................................................................................27

**TABLE OF AUTHORITIES**

**Pages**

**CASES**

*All State Home Mortgage, Inc. v. Daniel*, 187 Md. App. 166,
977 A.2d 438 (Md. App. 2009)......................................................................*passim*

*American Recovery Corp. v. Computerized Thermal Imaging, Inc.*,
96 F.3d 88 (4th Cir. 1996) ...................................................................18

*Anderson Adventures, LLC v. Sam & Murphy, Inc.*, 176 Md. App. 164,
932 A.2d 1186 (2007) ...................................................................11

*Barnes v. Euster*, 240 Md. 603, 214 A.2d 807 (1965)..........................................15

*Blair v. Scott Specialty Gases*, 283 F.3d 595 (3d Cir. 2002) .................................27

*Canaras v. Lift Truck Svcs., Inc.*, 272 Md. 337, 322 A.2d 866 (1974)..................24-25

*Cattail Assoc., Inc. v. Sass*, 170 Md. App. 474, 907 A.2d 828 (Md. App. 2006)..................22-23

*Cheek v. United Healthcare of the Mid-Atlantic, Inc.*, 378 Md. 139,
835 A.2d 656 (2003)...................................................................21

*Cochran v. Norkunas*, 398 Md. 1, 919 A.2d 700 (2007) ......................................9

*Coffey v. Mann*, 585 N.W.2d 518, 523 (Neb. App. 1998) .....................................22

*Crews v. Sullivan*, 133 Va. 478, 113 S.E. 865 (1922) .........................................15

*East Coast Hockey League, Inc. v. Professional Hockey Players Ass'n*,
322 F.3d 311 (4th Cir. 2003) .....................................................18

*First Operations of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 115 S.Ct. 1920,
131 L.Ed.2d 985 (1995) ...................................................................10, 11

*Halstead v. Globe Hoist Co.*, 231 F. Supp. 1012 (N.D. Cal. 1964)......................15

*Hartford Accident and Indemnity Co. v. Scarlett Harbor Assocs.*,
109 Md. App. 217 (1996) ...................................................................10

*Hooters of America, Inc. v. Phillips*, 173 F.3d 933 (4th Cir.1999)......................................11

*In re Thomas*, 2011 WL 576830 (Bankr. D. Mass. Feb. 9, 2011) ........................................13-14

*Iraq Middle Market Devel. Foundation v. Al Harmoosh*, 2011 WL 197980
(D. Md. Jan 20, 2011) ............................................................................................................25

*Jones v. Nationscredit Fin. Svcs. Corp.*, No. 24-C-02-00572
(Balt. City Cir. Feb. 3, 2003) ..................................................................................................3

*Laurel Race Course, Inc. v. Regal Const. Co., Inc.*, 274 Md. 142,
333 A.2d 319 (1975) ..............................................................................................................21

*Los Angeles Rams Football Club v. Cannon*, 185 F. Supp. 717 (S.D. Cal. 1960) ...............12

*Martin v. Basham*, 216 Va. 914, 223 S.E.2d 899 (1976)......................................................15

*Maxum Founds., Inc. v. Salus Corp.*, 779 F.2d 974 (4th Cir. 1985)......................................19

*McPhee Elec. Ltd., LLC v. Signal Perfection Ltd.*, 2010 WL 3245423
(D. Md. Aug. 16, 2010)...........................................................................................................11

*Microstrategy, Inc. v. Lauricia*, 268 F.3d 244 (4th Cir. 2001) .............................................18-19

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614,
105 S.Ct. 3346, 87 L.Ed.2d 444 (1985) .................................................................................10

*Moses H. Cone Memorial Hospital v. Mercury Const.*, 460 U.S. 1 (1983)...........................10

*Norkunas v. Cochran*, 168 Md. App. 192, 895 A.2d 1101 (2006) ........................................9

*Nova Research, Inc. v. Penske Truck Leasing Co.*, L.P., 405 Md. 435,
952 A.2d 275 (2008) ..............................................................................................................11

*O'Daniel Motors, Inc. v. Handy*, 390 S.W.2d 453 (Ky. Ct. App. 1965) ...............................12

*Petry v. Wells Fargo Bank, N.A.*, 597 F. Supp. 2d 558 (D. Md. 2009) ................................3

*Piland Corp. v. REA Cont. Co.*, 672 F. Supp. 244 (E.D. Va. 1987) .....................................15

*Roth v. Garcia Marquez*, 942 F.2d 617 (9th Cir. 1991)........................................................12

*RRCI Contractors, LLC v. Charlie's/Diamond Ready Mix, Inc.*, 2009 WL 799660
(D.V.I. Mar. 24, 2009) ...........................................................................................................15-16

*Sydnor v. Conseco Financial Servicing Corp.*, 252 F.3d 302 (4th Cir. 2001) ....................10

*Taylor v. Savings First Mtg., LLC*, No. 24-C-02-001635
(Balt. City Cir. Oct. 14, 2003) ...............................................................................3

*Thrash-Webster v. Charm City Mtg. Corp.*, No.-24-C-99-003984
(Balt. City Cir. Sept. 6, 2001) ................................................................................3

*Toppings v. Meritech Mortgage Svcs.,* 140 F. Supp.2d 683 (S.D. W. Va. 2001)..................27

*United States v. Roberts*, 436 F. Supp. 553 (E.D. Tex. 1977) ...............................................15

*Volt Info. Sciences, Inc. v. Board of Trustees*, 489 U.S. 468, 109 S.Ct. 1248,
103 L.Ed.2d 488 (1989) ........................................................................................10

*Winfrey v. Bridgestone/Firestone, Inc.*, 1999 WL 1295310 (8th Cir. Dec. 23, 1999)............22

## RULES

Fed. R. Civ. P. 15..................................................................................................1

## STATUTES

9 U.S.C. § 3.........................................................................................................18

## OTHER AUTHORITIES

Restatement (Second) of Contracts § 42................................................................20

Restatement (Second) of Contracts § 56..................................................................9

4-B Michie's Jur., Contracts § 19 (1986) .............................................................15

17 Am. Jur.2d, Contracts, § 56 (1964)..................................................................15

*The Arbitration Fairness Act of 2007*, Dec. 10, 2007, Sen. Hrg. 110-396 ...........................17

M. Dorsey, *et al.*, *Financing Residential Real Estate* (13th ed. 2005) ...................................17

Williston on Contracts § 5:8 ................................................................................20

Plaintiffs Anthony Brown and Bonita Brown (the "Browns") and Timothy Washington ("Mr. Washington, collectively "Plaintiffs"), submit this Opposition to Defendant Allied Home Mortgage Capital Corporation's Motion to Compel Arbitration and to Dismiss Complaint or in the Alternative to Stay Proceedings ("Motion").

## I.    INTRODUCTION

Allied Home Mortgage Capital Corporation ("Allied") asks the Court to compel arbitration of the Browns' claims based on a purported arbitration agreement which has, as an express condition precedent to the formation of the agreement, that both parties sign the agreement.  However, Allied never signed the purported agreement until ***eight and a half years after*** the Browns' transaction, did not sign it until ***eight and a half years after*** it had assigned all right, title and interest in the purported, unsigned agreement to another entity - Wells Fargo - and did not sign it until ***after*** the Browns filed their lawsuit.  In fact, Allied signed the purported agreement less than ***two weeks*** before it filed its Motion.

The purported arbitration agreement submitted by Allied is wholly ineffective.  As with any other contract, the Browns' offer to enter into the arbitration agreement was automatically withdrawn after a reasonable period of time for acceptance – and the eight and a half year lapse between the Browns' offer and Allied's signature far exceeded any "reasonable time" for acceptance.  Furthermore, Allied had no interest in the purported arbitration agreement at the time it signed it, as it had assigned all right title and interest in the agreement to Wells Fargo long before.  And Wells Fargo never signed the agreement – in fact, Wells Fargo's file for the Browns' transaction still contains a copy of the purported arbitration agreement ***unsigned by Allied or anyone other than the Browns, and Wells Fargo has independently waived all arbitration agreements with its customers***.  Defendant's sly attempt to dispose of this putative

class action case by attempting to enforce an arbitration agreement which simply does not exist should fail.

Moreover, Timothy Washington, another victim of Allied's scheme to cheat consumers and a named Plaintiff in this case, has affirmatively rejected any purported arbitration agreements with Allied – and Allied has not sought to compel arbitration of his claims.  *See* Exh. 1, Arbitration Rejection Letter.  Accordingly, this case is not subject to dismissal.

For all of these reasons, discussed more fully below, Allied's Motion should be denied.

## II.    BACKGROUND

### a.    Previous Litigation Involving the Plaintiffs' Table Funded Transactions, and Allied's Admission that Plaintiffs' Loans Were Table Funded

This case follows a recent class action in Baltimore City Circuit Court where Wells Fargo paid $7 million dollars to settle a class action on behalf of 14,211 borrowers – ***including named Plaintiffs and many others in the putative class in this case*** – alleging Wells Fargo's conspiracy to engage in the activities challenged in this lawsuit, in connection with many of the very transactions at issue in this lawsuit.[1]  *See* Final Approval Order in *Taylor v. Wells Fargo Home Mortgage, Inc.*, Case No. 24-C-02-001635, attached hereto as Exh. 2.   The Plaintiffs here – who are members of the settled *Taylor* class - were the victims of a scheme to needlessly collect significant (and unlawful) fees from Maryland consumers for their own profit using an illegal practice called "table funding."

The plain language of the Finder's Fee statute clearly prohibits the collection of Finder's Fees in table funded transactions, where the mortgage broker also acts as the nominal lender, as described by Judge Nickerson in another case involving Wells Fargo's table funding conspiracy with different entities:

---

[1]    The claims here were not released by the Settlement in *Taylor*.

> The Complaint alleges that Defendants' scheme involved two distinct steps. First, Long & Foster would arrange for homebuyers-in whose transactions it also acted as a real estate broker-to obtain a mortgage loan from Prosperity, a purported mortgage lender located in Long & Foster's various offices throughout the state of Maryland. According to Plaintiffs, however, Prosperity had no money of its own to lend and, instead of acting as lender, brokered the loan to Wells Fargo. Thus, although Prosperity held itself out as a lender, at the closing table, Wells Fargo provided the funds for the loan and received an assignment of the obligation. To the borrower, it appeared as if the assignment was only of the "servicing" rights to the loan to Wells Fargo, but according to Plaintiffs, Wells Fargo was also the source of funds for the loan and was thus, the funding lender.
> …
> Under § 12-804(e) of the Finder's Fee Act, "a mortgage broker may not charge a finder's fee in any transaction in which the mortgage broker . . . is the lender. . . ." The plain language of the statute clearly contemplates a situation where a mortgage broker acts as a mortgage lender.  What it forbids, on the other hand, is the collection of a fee by someone acting as both broker and lender.

*Petry v. Wells Fargo Bank, N.A.*, 597 F. Supp. 2d 558, 561, 562 (D. Md. 2009) [internal citations and footnote omitted].  *See also Taylor v. Savings First Mtg., LLC*, No. 24-C-02-001635 (Balt. City Cir. Oct. 14, 2003) (attached hereto as Exhibit 3); *Jones v. Nationscredit Fin. Svcs. Corp.*, No. 24-C-02-00572 (Balt. City Cir. Feb. 3, 2003) (attached hereto as Exhibit 4); *Thrash-Webster v. Charm City Mtg. Corp.*, No.-24-C-99-003984 (Balt. City Cir. Sept. 6, 2001) (attached hereto as Exhibit 5).

Here, Allied readily concedes that the Browns' loan ***was table-funded***.  *See* Declaration of Jeanne Stell ("Stell Decl."), attached as Exhibit 1 to Def. Mem., at ¶¶ 8-9 ("The Plaintiffs' loan was closed in November 2002 in what is known in the industry and under federal regulations as a 'table-funded transaction.'  In a 'table-funded' transaction, the mortgage broker is listed as the nominal lender on certain loan documents, by the loan is funded by a third-party lender who is assigned the loan documents either at closing or shortly thereafter.").

Now, wishing to avoid taking responsibility for its role in the illegal and underhanded table-funding scheme, Allied represents to this Court that it is entitled to compel arbitration of Plaintiff's claims even though it did not sign the arbitration document as required to make it

effective, and even though it assigned any rights it had to compel arbitration to Wells Fargo – which has waived all arbitration agreements with its customers as discussed in Part III.d, *infra*.

### b.  Allegations of the Complaint and Procedural History

Plaintiffs filed their Complaint in the Circuit Court for Baltimore County on February 1, 2011, and filed their First Amended Complaint ("FAC") in this Court on March 31, 2011.

The FAC alleges that Allied engaged in predatory mortgage brokering and lending practices in violation of the Maryland Finder's Fee Law and the Maryland Consumer Protection Act.  Specifically, from at least 2002, Allied has illegally served as both the mortgage broker and the mortgage lender in numerous "table funded" transactions and has taken mortgage broker finder's fees in those transactions.[2]  FAC ¶ 18.

Table funding refers to a settlement at which a loan is funded by a contemporaneous advance of loan funds and an assignment of the loan to the person advancing the funds.  *Id*.  This practice is particularly suspect because mortgage lenders (here, the Third Party Funding Lenders) generally rely on mortgage brokers and other referral sources to provide them with their business in the competitive mortgage lending market.  FAC ¶ 19.

In employing the table funding scheme, the Finder's Fees, paid by the borrower, were essentially funding the Third-Party Lenders' illegal referral fees and kickbacks to Allied in exchange for Allied sending its business to the Third Party Lenders.  A party acting as both mortgage broker and mortgage lender in a table-funded transaction and charging a finder's fee both violates the Finder's Fee Act and "facilitate[s] the predatory practice of loan flipping." *Jones v. Nationscredit Fin. Svcs. Corp.*, No. 24-C-02-00572 at 2 (Cir. Ct. Balt. City) (McCurdy,

---

[2] Table funding refers to a settlement at which a loan is funded by a contemporaneous advance of loan funds and an assignment of the loan to the person advancing the funds.  *Id*. at ¶ 12.

J.) (citation omitted) (attached as Exhibit 4).  Allied engaged in this nefarious practice, charging illegal finder's fees and engaging in predatory loan practices.  FAC at ¶ 1.

Anthony and Bonita Brown refinanced their home in Maryland with a mortgage through Allied in November 2002.  FAC. at ¶¶ 5-7, 36, 41.  In connection with the origination of their $115,000.00 mortgage loan, the Browns paid at least $4,029.70 in finder's fees to Allied, as shown by the "800" section of their HUD-1 Settlement Statement.  FAC at ¶ 7; see also FAC Exh. 1.  Allied procured, arranged, or otherwise assisted Plaintiffs in obtaining their mortgage loan funding through Wells Fargo Home Mortgage ("Wells Fargo"), a Third Party Funding Lender.  *Id*. at ¶ 24, 46-47.

The HUD-1 Settlement Statement for the Browns' November 2002 transaction identifies Allied as the lender, but Wells Fargo actually funded the mortgage loan.  Allied listed itself as the Lender, notwithstanding the facts that (1) the Third Party Funding Lender (Wells Fargo) is listed as the payee of the Note, (2) the Deed of Trust is to be sent to Wells Fargo after it is recorded, and (3) the Borrower is required to select a title insurer that is approved by Wells Fargo.  *Id*. at ¶ 18, 21.

Despite the fact that Allied is the identified lender in the Browns' mortgage loan transaction, Allied charged a substantial finder's fee for serving its role as the Browns' mortgage broker in finding Wells Fargo to fund the mortgage loan.  In fact, even though Allied charged at least $4,029.70 in finder's fees, it never provided the Browns—or *any* member of the putative class—with a written mortgage broker fee agreement, separate and distinct from any other document, advising the borrowers that "finder's fees" would be charged, as required under the Finder's Fee Act.  *Id*.  at ¶ 45.

Similarly, Timothy and Charles Washington refinanced their home in Maryland with a mortgage through Allied in March 2002, December 2002, and July 2003. FAC at ¶¶ 8-13, 37, 42. In connection with the origination of their mortgage loans – totaling $111,548.00, $109,599.00, and $109,592.00, respectively, the Washingtons paid at least $5,872.16, $4,757.74, and $3,800.33, respectively, in finder's fees to Allied, as shown by the "800" section of their HUD-1 Settlement Statements. *See id.*, *see also* FAC at Exhs. 2, 3, and 4. Allied procured, arranged, or otherwise assisted Plaintiffs in obtaining their mortgage loan funding through Wells Fargo Home Mortgage ("Wells Fargo"), a Third Party Funding Lender. *Id.* at ¶ 24, 46-47.

Like the Browns' transaction, the HUD-1 Settlement Statements for each of the Washington's transactions transaction identify Allied as the lender, but Wells Fargo actually funded the mortgage loans. Allied listed itself as the Lender, notwithstanding the facts that (1) the Third Party Funding Lender (Wells Fargo) is listed as the payee of the Note, (2) the Deed of Trust is to be sent to Wells Fargo after it is recorded, and (3) the Borrower is required to select a title insurer that is approved by Wells Fargo. *Id.* at ¶ 18, 21.

Despite the fact that Allied is the identified lender in the mortgage loan transactions of the Named Plaintiffs, Allied charged a substantial finder's fee for serving its role as the mortgage broker in each transaction for finding Wells Fargo to fund the mortgage loan. In fact, even though Allied charged thousands of dollars in finder's fees in each transaction, it never provided the Named Plaintiffs—or *any* member of the putative class—with a written mortgage broker fee agreement, separate and distinct from any other document, advising the borrowers that "finder's fees" would be charged, as required under the Finder's Fee Act. *Id.* at ¶ 45.

Allied removed the Complaint to this Court on March 11, 2011 and filed the present Motion, seeking to compel arbitration of the Browns' claims, on March 18, 2011. On March 31,

2011, Plaintiffs filed their Amended Complaint, adding Timothy Washington as a Named Plaintiff.  Defendant has not moved to compel arbitration of Mr. Washington's claims.

### c. **The Purported Arbitration Agreement**

The purported arbitration "agreement" Defendant seeks to use to keep the Browns out of court is completely unenforceable by its own terms.

*First*, Defendant admits that the purported agreement was signed by Allied more than eight years *after* the Browns offered to enter into the arbitration agreement.[3] *See* Stell Decl. at ¶ 10.  After receiving the Complaint, Michele Taylor – identified by Defendant as its corporate secretary - crossed out a space on the purported agreement for an additional borrower, wrote in Allied's name, signed, inserted a handwritten seal, and identified herself as "Secretary" of Allied – *on March 9, 2011*.[4]

*Second*, before closing the Plaintiffs' loan (and well over eight years prior to the Taylor signature), Allied assigned the entire loan file and "all right, title and interest" in it – including the arbitration document unsigned by Allied - to a separate entity (Wells Fargo), extinguishing any and all rights it had under the Arbitration document.  Defendant fails to even mention this material fact in its Motion, or the fact that Wells Fargo – which has all of Allied's rights in the arbitration document - still has the arbitration document *which remains unsigned by Allied*.  As

---

[3]     In fact, there is not even a signature line for Allied on the purported agreement – that, coupled with Allied's failure to sign the agreement for more than eight years, and Allied's similar failure to sign other arbitration agreements as revealed by reported case law, demonstrates that Allied never even *intended* to enter into these purported agreements. Only because it would be a convenient way for Allied to dispose of Plaintiffs' case does it even attempt to newly create an arbitration "agreement" at this time.

[4]     As described below, Plaintiffs request time to take discovery on a number of matters, including the unusual and belated signature of Michele Taylor and the Affidavit of Jeanne Stell, who identifies herself as "employed by First Lenders Alliance LLC."

discussed below, there are numerous other reasons why the purported arbitration agreement is no agreement at all.

## III.   ARGUMENT

Mr. Washington's claims, for which Allied has not moved to compel arbitration, are not subject to arbitration as he affirmatively rejected any purported arbitration agreements he may have signed, and has never received any such agreements signed by Allied.  On this basis alone, this case is not subject to dismissal.

Moreover, the purported arbitration agreement submitted by Allied regarding the Browns is ineffective for at least five reasons: 1) The terms of the purported arbitration agreement expressly require the signatures of both parties as a condition precedent to contract formation; without a signature from Allied or its assignee, there is no agreement to arbitrate;  2) any offer by the Browns in October 2002 to enter into an arbitration agreement lapsed well before Allied signed the agreement eight and one-half years later, on March 9, 2011; 3)  Defendant assigned the Browns' loan file to Wells Fargo prior to closing, extinguishing any claim to rights under the (unenforceable) Agreement; 4) the filing of the Browns' lawsuit revoked whatever offer to enter into an arbitration agreement which may have been on the table – and Allied did not sign the purported agreement until <u>after</u> this lawsuit was filed; and, 5) the Browns have in no way waived the condition precedent of Defendant's signature by filing this lawsuit or in any other way – the filing of this lawsuit acted, if anything, as a confirmation of the Browns' rejection of the arbitration agreement.  Defendant's attempt to keep the Browns from having their day in Court should, accordingly, fail.

> **a.   Named Plaintiff Timothy Washington Has Affirmatively Rejected Any Arbitration Agreements With Allied, and Has Not Received Any Arbitration Agreements Signed by Allied.**

On March 31, 2011, Plaintiffs amended the Complaint to add Timothy Washington as an additional Plaintiff and class representative (Doc. No. 18).   The FAC alleges that Timothy Washington and his father Charles Washington[5] refinanced the mortgage for their home at 5108 Richard Avenue, Baltimore, MD 21214 three times with Allied: on or about March 25, 2002; on or about December 27, 2002; and on or about July 28, 2003.   Mr. Washington alleges that Allied charged him thousands of dollars in illegal Finder's Fees in connection with each transaction, and that his loans were table-funded by Wells Fargo.   His claims are materially the same as the Brown's.

Mr. Washington **_expressly_** revoked any offer he made to enter into an arbitration agreement with Allied – and Allied has not even claimed to have signed any purported arbitration agreement with respect to his transactions.   _See_ Exh. 1, Arbitration Rejection Letter ("Mr. Washington hereby revokes and withdraws any offer to enter into an arbitration agreement with Allied (or any of its successors or assigns). . . .").[6]   Thus, even if the Browns were required to arbitrate their claims, arbitration of Mr. Washington's claims cannot be compelled.[7]   Indeed, Allied has not moved to compel arbitration of his claims.   Accordingly, the FAC is not subject to dismissal.

---

[5]     Charles Washington died on December 22, 2010.

[6]     Furthermore, for the same reasons discussed below with respect to the purported arbitration agreement with the Browns, any purported arbitration agreement with Mr. Washington is similarly ineffective.

[7]     If Allied should attempt to claim that it has signed some purported arbitration agreement in Mr. Washington's transaction but did not provide that document to him,  Maryland law does not countenance such "private acceptance."  _See e.g., Cochran v. Norkunas_, 398 Md. 1, 26, 919 A.2d 700, 715-16 (2007) ("The Buyers do not cite any supporting authority for their assertion that a document signed in private and never delivered or manifested by the Seller's acts constitutes an enforceable contract.  Indeed, under Maryland law, a contract is not formed until acceptance. . . .  Signing the contract in private without transmitting the documents or otherwise communicating acceptance to the Buyers or their agent does not create an enforceable agreement.")."  _See also Norkunas v. Cochran_, 168 Md. App. 192, 204, 895 A.2d 1101, 1108 (Md. Ct. App. 2006); Restatement (Second) of Contracts § 56 (1981) ("it is essential to an acceptance by promise either that the offeree exercise reasonable diligence to notify the offeror of acceptance or that the offeror receive the acceptance seasonably").

**b. Arbitration Cannot Be Compelled Because No Arbitration Agreement Exists Between the Parties – and Other Courts Have Rejected the Same Arbitration "Agreement" in Similar Circumstances.**

There is no agreement to arbitrate disputes between the Browns and Allied either – Allied did not sign the arbitration agreement when it held an interest in it, Allied's assignee never signed it, and Allied's attempt to sign it eight and one-half years after it assigned all of its rights in the document away, to Wells Fargo, is of no effect. Other courts faced with similar situations, including a previous attempt of Allied to enforce the same document, have declined to compel arbitration.

The United States Supreme Court has recognized that a dispute cannot be sent to arbitration without both parties' consent when a signed agreement does not exist. *See Moses H. Cone Memorial Hospital v. Mercury Const.*, 460 U.S. 1, 19-20 (1983); *see also Hartford Accident and Indemnity Co. v. Scarlett Harbor Assocs.*, 109 Md. App. 217, 290 (1996) ("If ... an [arbitration] agreement does not exist ... the court 'shall' deny the petition."). "While federal policy broadly favors arbitration, the initial inquiry is whether the parties agreed to arbitrate their dispute." *Sydnor v. Conseco Financial Servicing Corp.*, 252 F.3d 302, 305 (4th Cir. 2001) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626, 105 S.Ct. 3346, 87 L.Ed.2d 444 (1985)). "Congress did not intend for the FAA to force parties who had not agreed to arbitrate into a non-judicial forum, and therefore, federal courts must first decide whether the parties entered into an agreement to arbitrate their disputes." *Sydnor*, 252 F.3d at 305 (citing *Volt Info. Sciences, Inc. v. Board of Trustees*, 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989)). "In determining whether the parties executed a valid agreement to arbitrate, courts generally apply ordinary state-law principles that govern the formation of contracts."

10

*Sydnor*, 252 F.3d at 305 (citing *First Operations of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995)).

As this Court has noted, "[o]n a motion to dismiss based on the FAA, the Court 'engages in a limited review to ensure that the dispute is arbitrable -- i.e., that a valid agreement to arbitrate exists between the parties and that the specific dispute falls within the substantive scope of that agreement.' *Hooters of America, Inc. v. Phillips*, 173 F.3d 933, 938 (4th Cir.1999). In doing so, the Court applies state law principles of contract interpretation. *See First Operations of Chicago, Inc.*, 514 U.S. at 944, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995). *McPhee Elec. Ltd., LLC v. Signal Perfection Ltd.*, 2010 WL 3245423 at *2 (D. Md. Aug. 16, 2010) (attached hereto as Appendix A).[8]

Accordingly, in this case, Maryland contract law is applied to interpret the arbitration document. "In construing a contract, 'Maryland adheres to the principle of the objective interpretation of contracts. . . . If a contract is unambiguous, the court must give effect to its plain meaning and not contemplate what the parties may have subjectively intended by certain terms at the time of formation." *Id.* at 180, 447 (citing *Anderson Adventures, LLC v. Sam & Murphy, Inc.*, 176 Md. App. 164, 178, 932 A.2d 1186 (2007) and *Nova Research, Inc. v. Penske Truck Leasing Co.*, L.P., 405 Md. 435, 448, 952 A.2d 275 (2008) (internal quotations omitted).

Here, the purported arbitration agreement is not valid under well-settled Maryland contract law because it was not signed and accepted by Allied within a reasonable time. When an arbitration agreement requires the signatures of both parties to be effective, it must be signed by both parties as a condition precedent to its enforcement. *See All State Home Mortgage, Inc. v.*

---

[8] Because there is no contract to arbitrate, it is unnecessary to consider whether the Plaintiffs' claims fall within the scope of the purported Arbitration Agreement.

*Daniel*, 187 Md. App. 166, 977 A.2d 438 (Md. App. 2009), cert denied, 410 Md. 560, 979 A.2d

707 (Md. 2009) ("*All State*").

In *All State*, the court examined language materially identical to the purported arbitration

document presented by Allied here.  *See id*. at 171-73, 441-42.[9]  As here, "All State did not sign

the arbitration agreement.  The arbitration agreement also did not include an All State logo, or

any other information identifying All State as the other party to the agreement."  *Id*. at 171, 441.

Notably, the language requiring that both parties sign the agreement is the same in *All State* as it

is in this case:

> **This Agreement is effective and binding on both you and your heirs,
> successors and assigns and us <u>when it is signed by both parties</u>**.

*Id*. [emphasis added].

The *All State* Court, after examining the language of the contract held as follows: "Here,

the contract provided that '[t]his agreement is effective and binding. . . **when** both parties sign

it.'  [emphasis added by the *All State* Court].  This language in the contract provided, as a

condition precedent to an effective agreement, that both parties sign the agreement.  In the

absence of both signatures, no enforceable contract existed."  *Id*. at 183, 448.  *See also Los*

*Angeles Rams Football Club v. Cannon*, 185 F. Supp. 717, 719 (S.D. Cal. 1960); *Roth v. Garcia*

*Marquez*, 942 F.2d 617, 626 (9th Cir. 1991); *O'Daniel Motors, Inc. v. Handy*, 390 S.W.2d 453,

453 (Ky. Ct. App. 1965).

Here, as in *All State*, the language of the Agreement is clear and its requirement expressly

stated.  The signatures of ***both parties*** are required as a condition precedent to the formation of

the contract.  Allied is <u>never</u> mentioned in the document signed by the Browns, and there is no

indication that Allied is a party to the document signed by the Browns.  Allied's belated attempt

---

[9]     Indeed, Allied recognizes that the language of the *All State* arbitration document and the Browns'
arbitration document are "nearly identical."  *See* Def. Mem. at 8.

to meet the conditions of the Arbitration Agreement is unavailing and does not change the analysis by the *All State* court at all.  By the time Allied's agent inserted her signature onto the eight year old purported arbitration agreement on March 9, 2011, any offer by Mr. and Mrs. Brown to enter into any arbitration agreement had lapsed and was revoked, as described below.

In fact, the ***very agreement*** which Allied seeks to enforce here has ***specifically*** been found to require the signatures of both parties – ***including Allied*** – in order to be an enforceable contract.   *See In re Thomas*, 2011 WL 576830 (Bankr. D. Mass. Feb. 9, 2011) ("*Thomas*")(attached hereto as Appendix B), *citing All State*.

In *Thomas*, the Court rejected the attempt of the ***same party*** (Allied) to enforce ***the same agreement*** sought to be enforced here:

> The agreement is signed by the plaintiff only and not by Allied.  In fact, there is no reference to Allied by name anywhere in the agreement.   Rather than identifying Allied by name, the agreement consistently refers to the plaintiff's counterparty obscurely using the pronouns "we," "our" and "us."   The second paragraph of the agreement states that "[t]his Agreement is effective and binding on both you and your heirs, successors and assigns and us when it is signed by both parties.

*Id*. at \*2.  The *Thomas* court followed the holding in *All State*, finding that where the language of the arbitration agreement provided for it to be "effective and binding to [sic] you and your heirs, successors and assigns and us when both parties sign it," it established that the signature of both parties was a condition precedent to enforcement of the contract.  *Id*. at \*2 (citing *All State*, 187 Md. App. at 183, 977 A.2d at 438).

Here, the condition precedent for any purported arbitration agreement involving the Browns to become effective was not satisfied.  Defendant did not sign the purported agreement until after eight and one-half years had passed, after Defendant assigned all right, title and interest in the loan file (including the purported arbitration agreement), and after Plaintiffs

affirmatively revoked any offer to enter into an arbitration agreement by filing this lawsuit. There simply is no agreement to enforce here.

The only difference between this case and *Thomas* - that Allied signed the agreement *after more than eight years had passed* from the time the Browns signed – is of no moment. After all, if signing an arbitration agreement after such a lapse of time, and after Plaintiffs filed their complaint, was effective, then Allied could have simply signed the arbitration agreement in *Thomas* after the court's ruling that the unsigned "agreement" was unenforceable.  Of course, there is no indication it ever did so – perhaps it recognized how ridiculous a proposition that would be, although that is materially the same argument that Allied proposes the Court accept here.  The time for Allied to accept any offer by the Browns to agree to binding mandatory arbitration passed long before this lawsuit was filed, and even longer before Allied signed the purported "agreement."

Defendant, after being served with Plaintiffs' Complaint, and after losing its motion to compel arbitration in *Thomas* for failure to sign a similar arbitration agreement, attempted to revive the purported arbitration agreement in this case by signing it in March 2011 - after being served with Plaintiffs' Complaint.  However, Allied's opportunity to sign the purported agreement passed many years ago, and in any event passed when Allied assigned all of its interest in the purported agreement to Wells Fargo.

Allied's assertion that the condition precedent of signing the purported arbitration agreement is satisfied by its 2011 signature is untenable.  Aside from its other failings, it is just too late.  In Maryland, any offer – like any offer of the Browns to enter into the purported arbitration agreement – must be accepted within a reasonable time:

> It is hornbook law that an offer of no specified duration must be accepted within a time reasonable under the circumstances or the offer will lapse and a subsequent

> attempt to accept will be of no effect.  Restatement, Contracts § 40 (1932); 1
> Corbin, Contracts § 36 (1963); 17 C.J.S. Contracts § 51 (1963); *Van Camp Co. v.
> Smith*, 101 Md. 565, 573, 61 A.2d 284; *cf. Hagan v. Dundore*, 185 Md. 86, 43
> A.2d 181, 160 A.L.R. 517; and *Chapman v. Thomas*, 211 Md. 102, 126 A.2d 579.

*Barnes v. Euster*, 240 Md. 603, 607, 214 A.2d 807, 810 (1965) (finding a three year delay in

acceptance unreasonable under the circumstances).[10]

Here, the delay was nearly <u>three times</u> as long as the delay found unreasonable in *Barnes*.

There is no credible argument that it was reasonable under the circumstances for Allied to wait

nearly nine years to countersign the purported arbitration agreement, ***nor has Allied made any***

***such argument***.  Accordingly, no agreement to arbitrate exists between the Browns and Allied.

> **c.  Allied Assigned Away Any Rights Under the Arbitration Document in the Browns' Transaction in October 2002, Long Before It Ever Attempted to Sign the "Agreement."**

It is well-settled that the assignment of an arbitration agreement, as occurred when Allied

assigned the arbitration agreement here to Wells Fargo, divests Allied of any ability to accept

such an agreement after the fact.  For example, one federal district court dealt with a similar

situation involving an assignment of an arbitration agreement, and determined that, post-

assignment, the assignor was not a proper party to an arbitration, and that all arbitration rights

and responsibilities resided in the assignee – ***even where the agreement was signed before***

***assignment***:

> The thrust of RRCI's position is that both the assignor and assignee of an
> agreement may be compelled to arbitrate a dispute that comes within the scope of
> a valid arbitration agreement.  Such a position is unsupported by law.  *See*

---

[10]     *Barnes* is the definitive decision in Maryland on this issue, but other courts are in accord.  *See
e.g., Piland Corp. v. REA Cont. Co.*, 672 F. Supp. 244, 246-47 (E.D. Va. 1987) ("Where the offer is silent
on when acceptance must be exercised, it must be exercised within a reasonable time; otherwise the law
presumes it to be withdrawn, and a subsequent acceptance will impose no obligation on the proposer,
even though he has done no act and gives no notice of its withdrawal.") (citing *Crews v. Sullivan*, 133 Va.
478, 113 S.E. 865 (1922); *Martin v. Basham*, 216 Va. 914, 223 S.E.2d 899, 900 (1976); *United States v.
Roberts*, 436 F. Supp. 553 (E.D. Tex. 1977); *Halstead v. Globe Hoist Co.*, 231 F. Supp. 1012 (N.D. Cal.
1964); 4-B Michie's Jur., Contracts § 19 (1986); 17 Am. Jur.2d, Contracts, § 56 (1964).).

Restatement (Second) of Contracts § 317(1) (1981) ("An assignment of a right is a manifestation of the assignor's intention to transfer it by virtue of which *the assignor's right to performance by the obligor is extinguished* in whole or in part and the assignee acquires a right to such performance.") (emphasis supplied [by *RRCI Contractors* court]); *see also Affymax, Inc. v. Johnson & Johnson*, 420 F. Supp. 2d 876, 879 (N.D. Ill. 2006) ("[A]n assignment ordinarily extinguishes the right [of the assignor] to compel arbitration."). The Lease Agreement [which contains the agreement to arbitrate] is expressly between one lessor and one lessee, not two partial lessors and one lessee. Logic dictates that RRCI can bind only the party with which it is currently in contractual privity.

*RRCI Contractors, LLC v. Charlie's/Diamond Ready Mix, Inc.*, 2009 WL 799660, *5 (D.V.I. Mar. 24, 2009) (attached hereto as Appendix C). Here, of course, the purported arbitration agreement was not signed until *after* assignment.

On October 17, 2002, approximately two months prior to the Browns' loan closing, and nearly nine years before Allied attempted to sign the arbitration document, Molly Millard, an Allied Loan Processor, on behalf of Allied, sent an "Assignment Letter" to Wells Fargo, attached as Exh. 6. The Assignment Letter provided, in part: "This letter is to assign all rights, title, appraisal and interest in the above referenced loan file from Allied Mortgage Capital Corporation to Wells Fargo Mortgage, Inc. #685."

A copy of the Arbitration Agreement, unsigned by Allied, was included in the "loan file" assigned to Wells Fargo. *See* Exh. 7.[11] Wells Fargo **never** signed or attempted to sign the Agreement. Wells Fargo succeeded to the rights and obligations contained in the Browns' loan file, including the unsigned Arbitration Agreement. The assignment alone extinguishes any rights Allied may have once had under the unsigned document, including any rights to sign and

---

[11]   Counsel for Plaintiffs obtained the Browns' file from Wells Fargo, which included the Assignment Letter and a copy of the Arbitration Agreement still unsigned by Allied or anyone other than the Browns. Carney Declaration at ¶ 2, *see also* Exh. 7. The fact that Allied did not disclose this information – i.e. that it assigned all rights in the agreement, and that Wells Fargo still does not have an agreement signed by Allied - with the filing of their Motion underscores the importance of the need for discovery, if the Court does not deny Allied's Motion based on Plaintiffs' legal arguments.

accept the purported agreement, as well as any rights to *enforce* the agreement. *See RRCI Contractors, LLC.*

Accordingly, even if Allied had timely accepted the purported arbitration agreement, it could not compel arbitration now that it has assigned "all right, title and interest" in that agreement to Wells Fargo – and, even if that were not enough, ***Wells Fargo has waived all arbitration rights it has with its customers*** as discussed below.

### d.   Wells Fargo, the Assignee of the Browns' Loan File Including the Arbitration Document, Waived All Arbitration Rights on the Browns' Transaction.

Mandatory consumer arbitration clauses have long been criticized by a broad range of observers as being unfair, one-sided, and aimed primarily at preventing consumers from asserting claims against businesses, as opposed to simply shifting the forum in which such claims are decided.  *See*, *e.g.*, testimony before the U.S. Senate Comm. on the Judiciary, *S. 1782, The Arbitration Fairness Act of 2007*, Dec. 10, 2007, Sen. Hrg. 110-396, at 2, 10, 19, 45, 51, 60, 61-2.

Beginning in 2004, major players in the real estate industry began to pay attention to these criticisms.  One of them was the Federal National Mortgage Association (better known as "Fannie Mae," or simply "Fannie"), which buys and securitizes residential mortgages.  Because of its pivotal role in the residential real estate market, the ability to sell a mortgage to Fannie Mae – a so-called "conforming" loan – is essential to lenders such as Wells Fargo.  *See* M. Dorsey, *et al.*, *Financing Residential Real Estate* (13th ed. 2005) pp. 304-05.

Effective October 31, 2004, Fannie Mae announced that "mortgage loans that are subject to mandatory arbitration are ineligible for sale to, or securitization by, Fannie Mae." Exh. 8, pp. 4-5.  Fannie's sister institution, the Federal Home Loan Mortgage Corporation (better known as

"Freddie Mac"), which fulfills a similar role in buying "conforming" mortgages, later followed suit.  *See* Exh. 9.

To protect its valuable right to sell conforming mortgages to both Fannie Mae and Freddie Mac, Wells Fargo responded by making a bank-wide decision to waive, ***completely and without reservation***, all mandatory arbitration clauses in its loans.  The bank's August 29, 2005 press release stated that the bank's operating subsidiaries had made "changes to benefit customers of their nonprime real estate-secured lending businesses.  These improvements include . . . :

> • Eliminating mandatory arbitration clauses on real estate loans at Wells Fargo Financial to be consistent with Wells Fargo Home Mortgage."  [Exh. 10, p. 1.][12]

To be sure, Wells Fargo's borrowers (such as Plaintiffs herein) benefited from the Bank's decision to waive its mandatory consumer arbitration clauses.  But just as clearly, Wells Fargo benefited directly by complying with both Fannie Mae and Freddie Mac's strict terms for the purchase and sale of residential mortgages.

The Federal Arbitration Act provides that "a party with an arbitrable claim may apply for a stay of the trial of that action if 'the applicant for the stay is not in default in proceeding with such arbitration.'"  *American Recovery Corp. v. Computerized Thermal Imaging, Inc.*, 96 F.3d 88, 95 (4th Cir. 1996), *quoting* 9 U.S.C. § 3.  Given this authority, the courts in this Circuit have routinely adjudicated claims of waiver arising from motions to compel arbitration.  *See, e.g.*, *American Recovery Corp.*, *supra*; *Microstrategy, Inc. v. Lauricia*, 268 F.3d 244, 249 (4th Cir. 2001) (district court decided waiver issue, as did Court of Appeals); *East Coast Hockey League, Inc. v. Professional Hockey Players Ass'n*, 322 F.3d 311 (4th Cir. 2003) (same).

---

[12] WF Financial and WF Home Mortgage are the prime and subprime lending arms of Wells Fargo.

Almost without exception, arbitration waiver claims arise when the party seeking arbitration has already participated extensively in the litigation process. In such "litigation waiver" cases, the Fourth Circuit has held that the test is as follows: "A party may waive its right to insist on arbitration if the party so substantially utilizes the litigation machinery that to subsequently permit arbitration would prejudice the party opposing arbitration.'" *Microstrategy, supra*, 268 F.3d at 249 (*quoting Maxum Founds., Inc. v. Salus Corp.*, 779 F.2d 974, 981 (4th Cir. 1985)).

Obviously, this is not such a case. Here, the issue is not whether Wells Fargo's conduct is (as the question is commonly phrased) "tantamount to a waiver," because it IS a waiver: the bank has expressly renounced any right to rely on the arbitration clause in all circumstances by "[e]liminating mandatory arbitration clauses on real estate loans." Exh. 10. And Wells Fargo took this extraordinary step in order to secure an enormous financial benefit for the bank: the ability to sell conforming mortgages to Fannie Mae and Freddie Mac, which would not otherwise purchase the huge numbers of residential mortgages originated by the bank.

The blanket waiver effected by Wells Fargo's August 29, 2005 renunciation of arbitration in all its lending agreements is, of course, sufficient to resolve the issue for the Browns (and Mr. Washington) – whose loan was assigned to Wells Fargo contemporaneous with closing and was subject to Wells Fargo's affirmative waiver.

In short: Wells Fargo's decision to give up arbitration in its loan agreements, to protect its valuable franchise for re-sale of mortgages to Fannie Mae and Freddie Mac, should be enforced by this Court exactly as the bank announced it to the world and to their borrowers – and Allied cannot, after having assigned all of its rights in the arbitration agreement to Wells Fargo

(including the right to waive such an agreement), keep the Browns out of court on the basis of a long-ago waived "agreement."

> **e.      Plaintiffs Revoked Their Offer to Enter Into the Arbitration Agreement by Filing Their Lawsuit Prior to the Date Defendant Signed the Agreement**

Moreover, even assuming the Plaintiffs' offer to enter into the contract was still open after eight years (which it was not), and even assuming that any arbitration agreements in the Browns' transaction were not waived (which they were), the filing of Plaintiffs' lawsuit on February 1, 2011 gave Allied more than sufficient notice that the offer was definitively revoked.

"An offeree's power of acceptance is terminated when the offeree receives from the offeror a manifestation of an intention not to enter into the proposed contract."  Restatement (Second) of Contracts § 42.  *See also* Williston on Contracts § 5:8 ("as a result of the rule that unsealed promises without consideration are not binding, offers ... may be revoked by the offeror at any time prior to the creation of a contract by acceptance.").  An offer can be revoked prior to its acceptance if the offeror either expressly revokes the offer or implicitly revokes the offer by clearly manifesting an unwillingness to enter into the proposed bargain.  Restatement (Second) of Contracts § 42, Comment d.

The Browns' filing of their lawsuit clearly manifested the Browns' unwillingness to enter into the Arbitration Agreement.  Plaintiffs' revocation of any offer to enter into an arbitration agreement prior to Defendant's belated attempt to accept it provides yet another reason that the purported arbitration agreement is unenforceable.

> **f.      The Purported Arbitration "Agreement" is Not Supported by the Consideration Recited in the Document Itself.**

Allied argues that the since the Browns purportedly accepted "Allied's performance in processing the loan, [they] are now equitably estopped to deny the enforceability of [sic] Arbitration Agreement that was part of the consideration for the refinancing transaction."  Def.

Mem. at 12.  But Defendant omits the full recitation of consideration contained in the purported

agreement, which shows that *Allied did not provide the consideration it promised*:

> This Agreement is made in consideration of our processing of your inquiry or application for a loan secured by the property identified below ("loan") **and is also made in further consideration of our funding of the loan at the interest rate(s) and terms referenced in the loan documents**."

(emphasis added to show the portion of the consideration omitted by Defendant in its

discussion).    Thus, the Arbitration Agreement specifically names the funding of the loan as

required consideration.  This is fatal to Allied's Motion because, as alleged in the Complaint, and

*as conceded by Allied*, Allied did not actually fund the loan; **Wells Fargo funded the Plaintiffs'**

**loan**.[13]  FAC ¶¶ 31-40; see also Stell Decl. at ¶¶ 8-9.  Thus, Allied's assertion that it fully

performed under the contract is incorrect.  *Compare Cheek v. United Healthcare of the Mid-*

*Atlantic, Inc.*, 378 Md. 139, 161, 835 A.2d 656, 669 (2003) (finding arbitration agreement

unenforceable for lack of consideration where the employer's promise to arbitrate was illusory

and continued employment was insufficient consideration).

### g.  Plaintiffs Have Not Waived Allied's Countersignature

In a desperate attempt to resuscitate the purported arbitration agreement, Allied shoots

the last arrow in its quiver, arguing that Plaintiffs have waived the condition precedent of

Allied's countersignature and are estopped from denying enforceability of the Arbitration

Agreement simply by proceeding with their loan transaction – even though the purported

arbitration agreement is *ineffective by its own terms* without a countersignature.  *See* Exh.  7

("This agreement is binding … *when it is signed by both parties*.") [emphasis added].  Allied's

argument is without merit.

---

[13]      It is not in any way established that Allied "processed" the loan either, and the admitted table funding of the loan indicates that Wells Fargo, not Allied, actually processed the loan – and determining who processed the loan will require discovery.

"It is fundamental that where a contractual duty is subject to a condition precedent, whether express or implied, there is no duty of performance and there can be no breach by nonperformance until the condition precedent is either performed or excused." *Laurel Race Course, Inc. v. Regal Const. Co., Inc.*, 274 Md. 142, 154, 333 A.2d 319, 327 (1975) (citations omitted). "The existence of a condition precedent in a contract can be determined by the terms of the contract. . . ." *All State*, 187 Md. App. at 182, 977 A.2d at 448.

Here, the condition precedent has been neither effectively performed nor excused. Defendant willfully chose not to sign the Arbitration Agreement – perhaps to keep its options open in the belief it could decide whether to litigate – or, in the case of a class action, demand arbitration to effectively avoid liability – after a lawsuit was filed.  Allied, however, presents no basis for the equitable relief it requests.  The purported arbitration agreement unambiguously requires signatures of both parties – including Allied – and Allied simply did not sign the agreement in a timely manner, or before its interest in the agreement was assigned.  It cannot now claim that its agreement was implicit when its signature was explicitly required.  Indeed, cases finding mutual assent without requiring the presence of a party's signature have specifically distinguished themselves from the situation here – where the contract specifically requires a signature to be effective.  *See, e.g., Winfrey v. Bridgestone/Firestone, Inc.*, 1999 WL 1295310 (8th Cir. Dec. 23, 1999) (attached as Appendix D) ("'***in the absence of … an agreement by the parties that a contract shall not be binding until it is signed***, signatures of the parties are not essential for establishing a binding contract if manifestation of mutual assent is otherwise shown.'") [emphasis added] (*quoting Coffey v. Mann*, 585 N.W.2d 518, 523 (Neb. App. 1998)).

Allied cites to *Cattail Assoc., Inc. v. Sass*, 170 Md. App. 474, 499, 907 A.2d 828, 843 (Md. App. 2006), claiming it supports the proposition that a party may waive a condition precedent in the present circumstance.  This is simply not the case.  Cattail did not involve an express requirement of countersignature for the contract to be binding.  Moreover, Defendant cites only one parenthetical citation in a paragraph full of cites that clarify that waiver must be *unequivoval and of a condition that benefits the waiving party* (unlike here) in order to make its argument.  The full quotation, below, demonstrates that the waiver Allied claims is not available to it:

> "Waiver, however, 'must be clearly established and will not be inferred from equivocal acts or language.  Whether there has been a waiver of a contractual right involves a matter of intent that ordinarily turns on the factual circumstances of each case.'"  *Questar Homes of Avalon, LLC v. Pillar Const., Inc.*, 388 Md. 675, 687, 882 A.2d 288 (2005) (quoting *Gold Coast Mall, Inc. v. Larmar Corp.*, 298 Md. 96, 109, 468 A.2d 91 (1983)).  As recently stated by one court, "[i]t is well established that although a party may waive a provision included in a contract for that party's sole benefit, a party cannot waive a contractual requirement that benefits both sides to the transaction."  *Citadel Equity Fund Ltd. v. Aquila, Inc.*, 371 F. Supp. 2d 510, 520 (S.D.N.Y. 2005).

> > Accordingly, the application of the doctrine of waiver when one party seeks to enforce a contract and compel performance by the other party despite the nonoccurrence of a condition precedent to performance, ordinarily requires a determination whether the condition was inserted in the contract solely for the benefit of the party seeking to enforce the contract despite its nonoccurrence.

> Williston, *supra*, at § 39:24.

*Id*. at 499-500, 843.  Plaintiffs have not intentionally waived, expressly or impliedly, their right to performance by Defendant – and could not, given the language of the purported agreement.  And Defendant does not point to any action by the Plaintiffs to assert intentional, unequivocal waiver, but rather argues that Plaintiffs are "equitably estopped" from denying the enforceability of the Arbitration Agreement because it was part of the consideration for the refinancing agreement.  Def. Mem. at 12.

The fact that Plaintiffs' claims concern their refinancing transaction has nothing to do with the unenforceability of the Arbitration Agreement.  As described above, Defendant did not fund the loan.  Further, Defendant here was not a "nonsignatory" to the purported arbitration agreement because it was not a party to the contract - instead, it *chose* not to sign the contract. And when the purported arbitration agreement was assigned, Allied not only lost all interest in it (and any ability to compel arbitration) – ***but the assignee explicitly waive any arbitration rights that may have existed***.  Thus, to the extent equitable estoppel will on occasion permit a nonsignatory to an Arbitration Agreement to enforce the agreement, such doctrine is inapplicable here.

The cases Defendant cites in support of its assertion regarding equitable estoppel similarly have nothing to do with one party *choosing* not to sign a contract when required to by its terms in order to enforce it, and are otherwise inapposite.  For example, *Canaras v. Lift Truck Svcs., Inc.*, 272 Md. 337, 322 A.2d 866 (1974) concerned an attorney (Canaras) who, after many unsuccessful attempts to get the principals of a small company (Lift Truck) to sign a self-renewing employment contract for Canaras' services beginning on December 1, 1971, finally obtained the signatures (possibly because the principals believed they were signing a different agreement) on May 18, 1972.  *Id*. at 341-43, 868-70.  The contract provided that it would automatically renew in the absence of written notice from the principals.  *Id*. at 341, 868.  "The issue before the trial court was whether Lift Truck, by the execution of the contract on May 18, 1972, thereby intended to employ Canaras for a six-year term since on that date, the period of time required for notice of non-renewal – nine full months prior to November 1, 1972 (February 1, 1972) – had expired."  *Id*. at 351, 873-74.  Because the language of the contract was ambiguous or uncertain (unlike here, where the language is clear), the *Canaras* court looked to

extrinsic evidence.  *Id*. at 352-53, 874.  The "unjust forfeiture" Defendant attempts to claim for itself (Def. Mem. at 11, 12) is not available to them here, where the condition has not been excused and there has not been performance.  The *Canaras* court ultimately found that "[s]ince the condition in the renewal clause of Canaras' contract was impossible of performance by virtue of the expiration of time antecedent to the date of its execution, it must be held to have been 'nugatory' and incompatible with the provisions in Paragraph One. . . ."  *Id*. at 356, 876.  This holding does not help Defendant.

Further, Judge Blake's decision in *Iraq Middle Market Devel. Foundation v. Al Harmoosh*, 2011 WL 197980 (D. Md. Jan 20, 2011) (attached hereto as Appendix E) concerned entirely different circumstances.  In *Al Harmoosh*, the plaintiff, IMMDF, was a company that made a business loan to AGTTT, a company owned by the Defendant, Mr. Al Harmoosh.  The terms of the loan were memorialized in a "Loan Agreement," which Mr. Al Harmoosh signed on behalf of AGTTT, and which included a mandatory arbitration clause.  In addition, Mr. Al Harmoosh executed a promissory note ("Note") guaranteeing the loan.  When AGTTT failed to repay the loan, IMMDF filed a lawsuit against Al Harmoosh.  Al Harmoosh moved to dismiss in favor of arbitration.  *Id*. at *1

IMMDF argued that "because Al Harmoosh was not a party to the Loan Agreement containing the arbitration clause, the present dispute, in which it asserts a breach of the Note, is not arbitrable."  *Id*. at *2.  Thus, the defendant in *Al Harmoosh* was attempting to enforce an arbitration agreement against a non-party (in addition to a non-signatory) to the arbitration agreement, unlike here, where Allied *was* an original party to the arbitration agreement, who merely neglected to sign it, though required to by its terms.  The *Al Harmoosh* court employed the equitable doctrine of estoppel to enforce the contract because it found that the plaintiff's

claims rested on Al Harmoosh's breach under the Loan Agreement. *Id.* at 3. This equitable remedy is not available to Defendant here, where Defendant could have signed the contract, but chose not to do so under the mistaken belief that it was unnecessary. In essence, Allied was a nonsignatory to the arbitration agreement only because it chose to be so (until 2011) and, now that the agreement has been assigned and more than eight years have elapsed, Allied is stuck with its decision.

   **h.    Plaintiffs Should Be Permitted to Conduct Discovery If Necessary**

   For the reasons set forth above, Plaintiffs submit that there can be little question that no arbitration agreement exists. But to the extent this Court wishes to consider the purported arbitration agreement, discovery and a hearing are plainly essential to get to the bottom of certain related facts, such as Defendant's representation to this Court that Allied had a valid, binding and enforceable arbitration agreement, without disclosing the fact that it had assigned any and all rights in the purported arbitration agreement more than eight years ago, *see* Exh. 6. Similarly, if this Court has any doubt about whether Wells Fargo waived arbitration; or requires further information about the substantial benefits that Wells Fargo received as a result of its company-wide decision to waive arbitration, discovery is the only solution.

   Defendant has created an unusual set of circumstances in the 2011 signing of the Arbitration Agreement; details surrounding the 2011 signing are unknown to Plaintiffs. Although Plaintiffs believe that the decision in *All State* and that fact that Allied assigned away its rights in the Arbitration Agreement prior to the loan closing should dispose of Defendant's motion entirely, Plaintiffs respectfully request that they be permitted to conduct discovery on issues concerning the 2011 signing and the Arbitration Agreement if the Court is inclined to grant Defendant's motion. Plaintiffs require discovery, including the:

- production of documents concerning the Plaintiffs' loan files and the 2011 signing of the Arbitration Agreement, including documents concerning the employment relationships between Allied and Jeanne Stell[14] and Michele Taylor;

- deposition of Jeanne Stell; and

- deposition of Michele Taylor. *See* Carney Declaration ¶ 4.

The right to such discovery to resolve factual issues underlying a motion to compel arbitration is generally recognized under the Federal Arbitration Act. *See, e.g.*, *Blair v. Scott Specialty Gases*, 283 F.3d 595 (3d Cir. 2002) (remand for discovery into cost of arbitration procedure); *Toppings v. Meritech Mortgage Svcs.,* 140 F. Supp.2d 683, 685 (S.D. W. Va. 2001) (same for arbitrator bias and unconscionability generally).  The need for discovery and a hearing is even greater when the disputed or uncertain facts touch on submissions to this Court which are demonstrably false.

## IV.    CONCLUSION

---

[14] Defendant cites to Ms. Stell's Declaration, but it is unclear what relevance the declaration has, and even if it were relevant, it is rife with problems rendering it useless, including the following:

- Ms. Stell describes herself as an employee of First Lenders Alliance LLC and a former employee of Allied.  Ms. Stell does not state what, if any, relationship exists between First Lenders Alliance LLC and Allied.  Stell Decl. ¶ 2-3.
- Ms. Stell's Declaration is made based on "Allied's books and records," which she asserts forms the basis of her "direct personal knowledge."  Stell Decl. ¶ 5.
- Ms. Stell attests to Michele Taylor's signing of the Arbitration Agreement, although she does not purport to have witnessed the signature or to have personal knowledge with regard to Michele Taylor's handwriting/signature.  Stell Decl. ¶ 10.
- Ms. Stell does not state when Michele Taylor became the "corporate secretary" of Allied, including whether she was "corporate secretary" of Allied at the time the Plaintiffs' purportedly signed the Arbitration Agreement.

If the Court is not inclined to consider the purported arbitration agreement, it should at least permit Plaintiffs to take discovery of these matters, including the depositions of Jeanne Stell and Michele Taylor.

For all of the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion.

Dated:  April 11, 2011                        Respectfully submitted,


                                   _____/s/_____
                                   Benjamin H. Carney (Bar No. 27984)
                                   Richard S. Gordon (Bar No. 06886)
                                   Katherine B. Bornstein (Bar No. 28460)
                                   QUINN, GORDON & WOLF, CHTD.
                                   102 W. Pennsylvania Ave., Suite 402
                                   Towson, MD 21204
                                   Ph:  410.825.2300
                                   Fax: 410.825.0066
                                   rgordon@quinnlaw.com
                                   bcarney@quinnlaw.com

                                   Nevett Steele, Jr. (Bar No. 000371)
                                   LAW OFFICE OF NEVETT STEELE, JR.
                                   102 W. Pennsylvania Ave., Suite 402
                                   Towson, MD 21204
                                   Ph:  410.487.2333

                                   *Attorneys for Plaintiffs and the Class*